IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| AMY S. LLOYD, | ) | CASE NO. 4:11CV3006 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | MEMORANDUM |
| | ) | AND ORDER |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of the Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court on the denial, initially and on reconsideration, of the Plaintiff's supplemental security income ("SSI") benefits under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 1381, *et seq.* The Court has carefully considered the record and the parties' briefs, and the decision of the Commissioner will be affirmed for the reasons discussed below.

**PROCEDURAL BACKGROUND**

The Plaintiff, Amy S. Lloyd, filed for SSI benefits on December 15, 2008. (Tr. 122-25.) Lloyd alleges that she has been disabled since May 29, 2008,[1] based on back pain, asthma, anxiety, and her "emotional state." (Tr. 38-39.) Lloyd's claims were denied initially and on reconsideration. (Tr. 59-61, 63.) An administrative hearing was held before Administrative Law Judge ("ALJ") Mark R. Dawson on December 1, 2009. (Tr. 27-58.) On January 8, 2010, the ALJ issued a decision concluding that Lloyd is not "disabled" within the meaning of the Act and therefore is not eligible for SSI benefits. (Tr. 11-20.) The ALJ determined that, although Lloyd suffers from severe impairments, she has the residual

---

[1] In her application, Lloyd alleged an onset date of March 15, 2002. (Tr. 122.) She then amended the date to May 29, 2008. (Tr. 30.)

functional capacity to perform light work. The ALJ noted, however, that Lloyd has difficulty maintaining social functioning. (Tr. 13-15.) The Appeals Council denied Lloyd's request for review, and she now seeks judicial review of the ALJ's determination as the final decision of the Defendant, the Commissioner of the Social Security Administration ("SSA").

Lloyd claims that the ALJ's decision was incorrect because the ALJ failed to: (1) evaluate the opinions of state agency experts and analyze her mental residual functional capacity ("RFC"), and (2) apply *Polaski v. Heckler,* 739 F.2d 1320 (8th Cir. 1984).

Upon careful review of the record, the parties' briefs and the law, the Court concludes that the ALJ's decision denying benefits is supported by substantial evidence on the record as a whole. Therefore, the Court affirms the Commissioner's decision.

## FACTUAL BACKGROUND

Lloyd is thirty-three years old, has a ninth grade education,[2] and has worked as a cashier, convenience store clerk, dishwasher, waitress, and fast food worker. (Tr. 19, 33, 54, 122, 147, 153, 207.) After her alleged onset date, from June 2008 through January 2009, Lloyd continued to work part-time at a pizza shop preparing pizzas and operating the cash register. (Tr. 37, 207.)

**Medical Records**[3]

In September 2007, eight months before the start of her alleged disability, Lloyd saw psychiatrist Pratap V. Pothuloori, M.D., for monitoring and medication management. Lloyd

---

[2] Lloyd was enrolled in special education classes. (Tr. 153.)

[3] Lloyd does not challenge the ALJ's evaluation of her physical impairments and resulting limitations. Rather, Lloyd argues only that the ALJ erred in evaluating medical opinions and her subjective complaints regarding her mental limitations. (Filing No. 13, at 5-9.) Therefore, the Court has limited the discussion of Lloyd's medical history to her mental impairments.

reported that she lost nearly twenty pounds[4] and that her mood improved. She said that she was not sad and had no problems with anxiety, panic attacks, or obsessive compulsive thoughts. She was cooperative and fully oriented. Dr. Pothuloori diagnosed depressive disorder and a history of amphetamine abuse. He assigned Lloyd a Global Assessment of Functioning ("GAF") score of 70 and continued the following medications: Wellbutrin; Zoloft; and Lunesta. (Tr. 363.)

On December 13, 2007, Lloyd returned to Dr. Pothuloori. Lloyd reported that she was taking her medications regularly and was doing "fairly well." (Tr. 362.) Lloyd again reported that she was not sad or depressed and had no problems with anxiety or panic attacks. Lloyd was pleasant and cooperative. Dr. Pothuloori assigned Lloyd a GAF score of 75 and continued her medication regimen. (Tr. 362.)

On April 3, 2008, Lloyd returned to Dr. Pothuloori. She reported that her disability application had been denied and that she was depressed and anxious. She denied, however, having any panic attacks or obsessive compulsive thoughts. On examination, Lloyd continued to be cooperative and oriented. Dr. Pothuloori assigned Lloyd a GAF score of 65 and increased her Zoloft. (Tr. 360.)

On June 19, 2008, one month after she alleges she became disabled and unable to work, Lloyd returned to Dr. Pothuloori. She reported that her mood was somewhat better but that she continued to have some problems with anxiety. (Tr. 359.) She was cooperative and fully oriented. Dr. Pothuloori assigned Lloyd a GAF score of 70 and continued to treat her with the same medication regimen. (Tr. 359.)

---

[4]At the time of the hearing, Lloyd was five feet four inches tall and weighed 280 pounds. (Tr. 31.)

3

On August 20, 2008, Lloyd told Dr. Pothuloori that she had not been taking her medications as prescribed and that her boyfriend had ended their relationship. Lloyd reported feeling depressed, unmotivated, and anxious, although she denied having any panic attacks or obsessive compulsive thoughts. Dr. Pothuloori again assigned Lloyd a GAF score of 70 and continued Lloyd on her medications. (Tr. 357.)

On November 20, 2008, Lloyd told Dr. Pothuloori that she was somewhat anxious. She reported working part-time at a pizza shop. She also admitted she was not taking her medication as prescribed, and she denied being depressed or having any problems staying focused. Lloyd remained cooperative and fully oriented. Dr. Pothuloori assigned Lloyd a GAF score of 70 and maintained the increased dosage of her Zoloft. (Tr. 355.) The administrative record includes no additional mental health treatment notes from Dr. Pothuloori.

On January 19, 2009, Lloyd saw Tawnya Meadows, Ph.D., for a consultative psychological evaluation. (Tr. 368-72.) Lloyd reported her continued work as a cook at a pizza shop, and she said that she got "along well with her boss and co-workers." (Tr. 369.) She said she had no significant problems working except that she sometimes got depressed and needed a few minutes to herself. Significantly, Lloyd told Dr. Meadows that certain things, such as the word, "Armageddon" disturbed her, and that she had panic attacks twice weekly due to her boyfriend being out of the state and her daughter's removal from her custody. Lloyd reported recent use of marijuana and methamphetamine, noting that her drug use was the reason her daughter was removed from her custody. She reported having suicidal thoughts, but she had no specific suicidal plan. (Tr. 369.) Lloyd's speech was goal-directed, and she demonstrated no evidence of rambling, racing

4

thoughts, or flight of ideas. She appeared depressed and her insight and judgment were poor, but Dr. Meadows described Lloyd's concentration and mental acuity as generally intact. (Tr. 370.) Based on her one-time consultative examination, Dr. Meadows assigned Lloyd a GAF score of 50 and opined that Lloyd's activities of daily living were restricted by her self-reported panic attacks. (Tr. 367.) Significantly, however, Dr. Meadows opined that Lloyd had no problems with social functioning, concentration, or memory span, and stated that Lloyd "reportedly" relates appropriately with co-workers and supervisors. (Tr. 367, 371.)

On January 27, 2009, state agency psychologist Christopher Milne, Ph.D., opined, based on his review of the record, that Lloyd had a "major depressive disorder, mild" no restrictions in her activities of daily living, no limitations with concentration, persistence, and pace, and moderate difficulties with social functioning. (Tr. 397, 404.) Dr. Milne further opined that Lloyd, based on her depressive disorder, would be "moderately limited" in her ability to perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, work in coordination with or proximity to others without being distracted, complete a normal workday and workweek without interruptions, interact appropriately with the general public, and respond appropriately to changes in the work setting. (Tr. 389-90.) Dr. Milne, however, did not elaborate on what he meant by "moderately limited,"[5] and he did not provide a detailed functional assessment beyond stating his opinion that Lloyd could follow simple instructions. (Tr. 391, 406.) Another state

---

[5]He noted his opinions by checking a box on the mental RFC assessment form labeled "moderately limited." (Tr. 389-90.)

5

agency psychologist, Jennifer Bruning Brown, Ph.D., affirmed Dr. Milne's opinion. (Tr. 506.)

In May 2009, Lloyd began therapy with Jill Colegrove. (Tr. 526-31.) During her first session, Lloyd admitted that she had tested positive for marijuana and used methamphetamine in or around December 2008, and that child protection services had removed her seven-year-old daughter from her home. (Tr. 526-27, 529.) She told Ms. Colegrove that her daughter was currently living with her brother, but was expected to return to Lloyd's home later that month. (Tr. 527.) Lloyd said that she had two close friends, and that she enjoyed reading, walking, swimming, and attending bible studies. (Tr. 527.) She also noted that she was not taking her medications prescribed by Dr. Pothuloori because she was five months pregnant. (Tr. 527.) She had worked part-time at a pizza shop until the business closed in January 2009. (Tr. 528.) On examination, Lloyd had good eye contact, she appeared a "bit anxious," her speech was clear and coherent, her mood was normal, her thought processes were logical and goal-oriented, her judgment was good, and her insight and concentration were fair. (Tr. 530.) Ms. Colegrove assessed Lloyd with depressive disorder, generalized anxiety disorder, and cannabis dependence (sustained partial remission), assigned Lloyd a GAF score of 60, and recommended continued therapy. Ms. Colegrove also recommended that Lloyd address her addiction. (Tr. 530-31.) Later that month, Lloyd told Ms. Colegrove that her daughter was home and that things were going "well." (Tr. 525.) She said that her biggest struggle was her anxiety, i.e., worrying about matters such as the world ending, something bad happening to her family, and her daughter falling out of the car. She said she also had problems meeting her boyfriend's expectations. (Tr. 525.) In June 2009, Lloyd returned to Ms. Colegrove

three times for counseling. (Tr. 523-24.) During these sessions, Lloyd reported that her pregnancy was going well and that she was getting back together with her boyfriend. (Tr. 524.) Lloyd, however, reported that she continued to have obsessive thoughts. (Tr. 524.) Ms. Colegrove noted that Lloyd appeared to be overwhelmed and stressed with obsessive thoughts about her relationships. Ms. Colegrove encouraged Lloyd to seek help from her psychiatrist. (Tr. 524.)

In July 2009, Lloyd told Ms. Colegrove that she had started taking Lexapro and her relationship with her boyfriend had greatly improved. Ms. Colegrove discussed the importance of setting goals to build self-esteem. (Tr. 523.) Later that month, Lloyd returned to Ms. Colegrove for counseling. She continued to report problems with obsessive thoughts. (Tr. 522.) During the next two months, Lloyd continued to see Ms. Colegrove. (Tr. 520-21.) She reported that things were "going well" and that she was enjoying her time with her boyfriend and daughter. (Tr. 520.) In October 2009, Ms. Colegrove formally discharged Lloyd from treatment. In the discharge summary, Ms. Colegrove noted that Lloyd had stopped attending therapy due to the birth of her baby. She assigned Lloyd a GAF score of 60 to 64 for the period of treatment, and recommended that Lloyd and her boyfriend obtain counseling together. (Tr. 519.)

**Lloyd's Testimony**

At the administrative hearing, Lloyd testified that she was then thirty-one years old, and that she was five feet four inches tall and weighed 280 pounds. (Tr. 31.) She stated she was single and lived with two children. (Tr. 31-32.) She had a ninth grade education, and she had been enrolled in special education classes. (Tr. 32.) Lloyd described her past work as a convenience store cashier and cook, and a dishwasher; and she most

recently worked at a pizza store cooking, making pizzas, cashiering and cleaning for about fifteen hours per week. (Tr. 33-37.) Lloyd began the pizza store job after the onset of her alleged disability; worked there for about seven months; and left when the pizza store closed. (Tr. 37.)

Lloyd testified that her back pain and emotional problems kept her from working full time. (Tr. 39.) She stated that she had not seen anyone for her back pain since she delivered her baby. (Tr. 41.) She said she could stand for fifteen to twenty minutes at a time and sit for thirty minutes. (Tr. 48-49.) Regarding her anxiety, that arose when she was under stress, Lloyd testified that it caused her to feel as if she were losing control; caused her to have difficulty breathing; and caused her to feel tingly. (Tr. 43.) Her stress triggers included "[f]ighting" with her boyfriend, working, unexpected matters, and dealing with customers and coworkers. (Tr. 43-46.) Essentially, Lloyd did not "like people." (Tr. 44.)

Lloyd testified that she last used marijuana in December 2008. (Tr. 47.) At the time of the hearing, Lloyd was taking the following prescribed medications: Wellbutrin; Lexapro; Albuterol; and Advair. (Tr. 48.) She cared for her baby with her mother's help. (Tr. 48.)

Lloyd stated that she lay down between four and five hours daily. She tried to do some housework, wash dishes, and vacuum. (Tr. 51-52.) She had difficulty bending, squatting, and climbing stairs. (Tr. 51.) She testified that she had no problems using her hands. (Tr. 53.)

**Vocational Expert's Testimony**

Deborah Determan,[6] a vocational expert ("VE"), testified in response to a hypothetical question from the ALJ in which he outlined Lloyd's age, education, and work experience. (Tr. 54-55.) The ALJ's hypothetical individual could perform light exertional work but was moderately limited in social functioning. The ALJ defined "moderately limited" with respect to social functioning to mean that the person could not perform work involving significant public interaction as a primary component. (Tr. 54-55.) The VE opined that the individual would be precluded from performing the type of work Lloyd did in her past, but could perform the jobs of an office helper, housekeeper, and production assembler. Those jobs are available in significant numbers in regional and national economies. (Tr. 55.)

Lloyd's attorney asked whether the moderate limitations described by Dr. Milne would preclude work. (Tr. 56-57.) The attorney defined "moderate" as impaired. The VE found that definition not particularly helpful. However, she stated that if a "moderate" limitation is one that by itself would not preclude work but that, together with a combination of moderate impairments, would preclude work, an individual with all of the limitations listed by Dr. Milne would be unable to perform competitive work. (Tr. 57-58.)

## THE ALJ'S DECISION

After following the sequential evaluation process set out in 20 C.F.R. § 416.920, the ALJ concluded that Lloyd was not disabled. (Tr. 20.) Specifically, at step one the ALJ found that Lloyd had not performed substantial gainful work activity since December 15,

---

[6]Ms. Determan's curriculum vitae is in the record. (Tr. 112-14.)

9

2008, her application date. The ALJ noted that Lloyd worked after her onset date, but that work did not rise to the level of substantial gainful activity. At step two, the ALJ found the following medically determinable severe impairments: methamphetamine and marijuana dependence, in partial remission; obesity; generalized anxiety disorder; and degenerative disc disease of the lumbar spine. At step three, the ALJ found that Lloyd's medically determinable impairments, either singly or collectively, did not meet Appendix 1 to Subpart P of the Social Security Administration's Regulations No. 4, known as the "listings." (Tr. 13.) The ALJ determined that Lloyd had the residual functional capacity to perform light work, except that she had moderate difficulties in maintaining social functioning. (Tr. 15.) At step four, the ALJ determined that, Lloyd did not possess the RFC to perform her past relevant work. At step five, the ALJ concluded that Lloyd could perform other light jobs that exist in significant numbers in the local and national economies, such as: office helper; housekeeper; or production assembler. (Tr. 19.) In summary, the ALJ found that Lloyd was not disabled. (Tr. 20.)

## STANDARD OF REVIEW

In reviewing a decision to deny disability benefits, a district court does not reweigh evidence or the credibility of witnesses or revisit issues *de novo*. Rather, the district court's role under 42 U.S.C. § 405(g) is limited to determining whether substantial evidence in the record as a whole supports the Commissioner's decision and, if so, to affirming that decision. *Howe v. Astrue,* 499 F.3d 835, 839 (8th Cir. 2007.)

"'Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision.'" *Slusser v. Astrue,* 557 F.3d 923, 925 (8th Cir. 2009) (quoting *Gonzales v. Barnhart,* 465 F.3d 890, 894 (8th Cir. 2006)). The

Court must consider evidence that both detracts from, as well as supports, the Commissioner's decision. *Carlson v. Astrue,* 604 F.3d 589, 592 (8th Cir. 2010). As long as substantial evidence supports the Commissioner's decision, that decision may not be reversed merely because substantial evidence would also support a different conclusion or because a district court would decide the case differently. *Fredrickson v. Barnhart,* 359 F.3d 972, 976 (8th Cir. 2004).

## ANALYSIS

### I.  Evaluation of Opinions of State Agency Experts; RFC Analysis

Lloyd argues that the ALJ did not properly evaluate the opinions of state agency experts, resulting in an insufficient RFC analysis. It appears that Lloyd's counsel suggests that the ALJ failed to give proper weight to the opinions of Drs. Milne, Brown, and Meadows. It then appears that Lloyd's counsel argues that, if those opinions had been properly considered, Lloyd would not have sufficient RFC to perform any work.

"RFC is defined as the most a claimant can still do despite his or her physical or mental limitations." *Leckenby v. Astrue,* 487 F.3d 626, 631 n. 5 (8th Cir.2007). "The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC." *Vossen v. Astrue,* 612 F.3d 1011, 1016 (8th Cir.2010). "The RFC must (1) give 'appropriate consideration to all of [the claimant's] impairments,' and (2) be based on competent medical evidence establishing the 'physical and mental activity that the claimant can perform in a work setting.'" *Partee v, Astrue,* 638 F.3d 860, 865 (8th Cir. 2011) (quoting *Ostronski v. Chater,* 94 F.3d 413, 418 (8th Cir.1996)). In determining RFC, an ALJ should consider "[m]edical records, physician observations, and the claimant's subjective

11

statements about [her] capabilities." *Id.* (citing *Eichelberger v. Barnhart,* 390 F.3d 584, 591 (8th Cir.2004)).

In Lloyd's case, the ALJ noted the absence in the record of opinions from treating sources. The ALJ discussed all the opinions from examining nontreating sources (Tawnya J. Meadows, Ph.D.; Larry D. Birch, M.D.) and the state agency consultants/nonexamining expert sources (Jerry Reed, M.D.; Glen Knosp, M.D.; Christopher Milne, Ph.D.; Jennifer Bruning Brown, Ph.D.). The Court agrees with the ALJ that the opinions of all of the nontreating sources and state agency consultants/nonexamining expert sources, in addition to other evidence, support the RFC assessment. Lloyd's daily activities included daily child care and chores including housework, dishwashing, and vacuuming. Lloyd had no difficulty using her hands. She worked after her alleged onset date at a pizza shop, and the job ended only because the shop closed. When Lloyd stopped seeing her psychiatrist, she was not taking her prescribed medications. According to Dr. Meadows, Lloyd's daily activities were only limited by *self-reported* panic attacks. Lloyd stopped attending therapy sessions with Ms. Colegrove. In summary, the medical and nonmedical evidence, including Lloyd's own testimony, support the ALJ's RFC assessment.

## II.     *Polaski* Factors

Lloyd also contends that the ALJ failed to consider the factors set out in *Polaski* relating to: her daily activities; the duration, frequency and intensity of pain; dosage, effectiveness, and side effects of medication; precipitating and aggravating factors; and functional restrictions when evaluating her subjective complaints, or related inconsistencies.

There is no requirement that an ALJ cite the *Polaski* decision or discuss every *Polaski* factor. It is sufficient if *Polaski* factors are referenced and considered and that an ALJ's credibility findings are adequately explained and supported. *Steed v. Astrue,* 524 F.3d 872, 876 (8th Cir. 2008); *Lowe v. Apfel,* 226 F.3d 969, 972 (8th Cir. 2000).

In this case, the ALJ cited to the applicable Social Security regulations. He listed and discussed the five steps of the required sequential evaluation process for determining whether an individual is disabled. He then set out his detailed findings of fact and conclusions of law in which he considered each of those required steps. In doing so he made detailed references to the medical record in discussing the regulations, and inconsistencies with Lloyd's subjective complaints of pain. The *Polaski* factors were considered.

## CONCLUSION

For the reasons discussed, the Court concludes that the Commissioner's decision was supported by substantial evidence on the record as a whole and is affirmed.

IT IS ORDERED:

1. The Commissioner's decision is affirmed;

2. The appeal is denied; and

3. Judgment in favor of the Defendant will be entered in a separate document.

DATED this 28th day of July, 2011.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge